**WASHINGTON AREA CARPENTERS'
WELFARE FUND, et al., Appellants,**

v.

**OVERHEAD DOOR CO. OF METRO-
POLITAN WASHINGTON.**

No. 80–1501.

United States Court of Appeals,
District of Columbia Circuit.

Argued 14 May 1981.
Decided 15 June 1982.

Joseph Semo, Washington, D. C., with whom Ira M. Lechner, Washington, D. C., was on the brief, for appellants.

William T. Torgerson, Washington, D. C., with whom John J. Ross and Wendy T. Kirby, Washington, D. C., were on the brief, for appellee.

Gerald M. Feder, Robert J. Connerton and Theodore T. Green, Washington, D. C., were on the brief for amicus curiae, Nat. Coordinating Committee for Multiemployer Plans, urging reversal.

Laurence J. Cohen and Terry R. Yellig, Washington, D. C., were on the brief for amicus curiae, Building and Const. Trades Dept., AFL–CIO, urging reversal.

Gerard C. Smetana, Chicago, Ill., and William H. DuRoss, III, Washington, D. C., were on the brief for amicus curiae, Associated Builders and Contractors, Inc., urging affirmance.

Before ROBINSON, Chief Judge, HOMER THORNBERRY,* Senior Circuit Judge, and WILKEY, Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This is an appeal of the district court's grant of summary judgment in favor of appellee Overhead Door Company of Metropolitan Washington. Appellants, union fringe benefit funds ("the Funds"), brought suit in January 1979 to recover contributions Overhead Door allegedly owed the Funds under successive agreements with the Carpenters' District Council Washington, D. C. and Vicinity ("the Union"). Overhead Door argued that these "prehire" agreements, made pursuant to section 8(f) of the National Labor Relations Act (NLRA),[1] were not enforceable because the Union never gained majority support of the bargaining unit. The district court agreed, and entered summary judgment against the Funds. We reverse.

## I. BACKGROUND

■ Section 8(f) of the NLRA provides that it shall not be an unfair labor practice for construction industry unions and employers to make agreements (called "prehire" agreements), even though the union has not attained majority status among the workers.[2] This exempts construction industry employers from the normal rule that bargaining with anyone other than the majority representative is an unfair labor practice.[3] Once the union gains majority support, the prehire agreement matures into a fully effective collective bargaining agreement.[4] The status of a prehire agreement prior to that time is the issue in this case.

* Of the United States Court of Appeals for the Fifth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. 29 U.S.C. § 158(f) (1976).

2. Id.

3. See International Ladies' Garment Workers Union v. NLRB, 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961).

4. See NLRB v. Local 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 341, 98 S.Ct. 651, 655, 54 L.Ed.2d 586 (1978).

In 1969 an area-wide collective bargaining agreement existed between the Union and the Construction Contractors Council, Inc. of Washington, D. C., an employers association. Overhead Door was not a member of the Contractors Council and thus not a party to the agreement. According to the president of Overhead Door, in October 1969 the company was told by the Union's representative that to complete a job it was working on as a subcontractor it would have to sign an agreement with the Union, and its two employees working on the job would have to join the Union.[5] These workers complied, leaving Overhead Door with three Union members out of fifteen employees. Overhead Door also complied, entering into an "Acceptance Agreement" which incorporated the terms of the area-wide collective bargaining agreement. Similar Acceptance Agreements were signed by Overhead Door in July 1972 and December 1976, incorporating the provisions of subsequent area-wide agreements. The 1976 agreement expired in 1978, meaning that the agreements between Overhead Door and the Union were in effect for a ten-year period.

The parties agree that these Acceptance Agreements, which cover all terms and conditions of employment for carpentry services, were prehire agreements. One provision of each agreement required Overhead Door to make contributions to the Funds on behalf of all covered employees. For example, by the end of the ten-year period Overhead Door was required to pay, for each hour worked by each employee, $.80 per hour to the Health and Welfare Fund, $.60 per hour to the Pension Fund, and $.07 per hour to the Apprenticeship Training Fund. In 1976 the Funds conducted a partial audit of the company's records, and concluded that it had failed to make contributions for most employees and had undercounted the hours worked by the few employees for whom contributions were made.

In January 1979 the Funds brought this suit under section 301 of the Labor Management Relations Act and section 502 of the Employee Retirement Income Security Act,[6] seeking to collect the unpaid contributions. In response Overhead Door conceded that it contributed to the Funds on behalf of its three union employees, who have received some benefits from the Funds. It argued, however, that the agreements did not cover most hours worked by two of these three employees because one had not worked as a carpenter since 1969 and the other had been a supervisor since 1969. More important, the company denied responsibility for contributions based on hours worked by its nonunion employees. It claimed that it had never applied the agreements to these employees, and asserted that the agreements could not be enforced because the Union had not achieved majority status.

In April 1980 the district court granted summary judgment for Overhead Door. It determined that agreements under section 8(f) are permissible but not enforceable until the union gains majority support among the employees. The court also rejected the Funds' argument that the company was not permitted to assert the defense of unenforceability in a suit brought by the Funds, third party beneficiaries of the agreements. Since the Funds failed to establish the majority status of the Union, the agreements could not be enforced. Overhead Door was not liable for contributions on behalf of any employees, whether union or nonunion.[7]

The Funds then appealed. On 12 June 1981 this court stayed the appeal pending the Supreme Court's decision in *Kaiser Steel Corp. v. Mullins*.[8] In *Mullins* this court had held that in a suit brought by union funds to recover unpaid contributions, the employer could not raise the defense that the contract was illegal. The

---

5. The alleged use of threats to force Overhead Door to sign the agreement is not at issue in this case, as the company never filed an unfair labor practice charge.

6. 29 U.S.C. § 185 (1976); *id.* § 1132.

7. 488 F.Supp. 816 (D.D.C.1980).

8. —— U.S. ——, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), *rev'g* 642 F.2d 1302 (D.C.Cir.1980).

Supreme Court reversed, holding that the defense of illegality was legitimate.

Turning again to this appeal, we reverse and remand to the district court for a decision on the merits of the Funds' claims.

## II. LEGITIMATE EMPLOYER DEFENSES TO A TRUST FUND SUIT TO RECOVER UNPAID CONTRIBUTIONS

The Funds contend that Overhead Door is not entitled to defend this suit on the basis of the alleged unenforceability of the pre-hire agreements. The district court rejected this argument, but the legal bases of its decision have been largely superceded by a recent Supreme Court decision and a new statutory provision dealing with this issue. We therefore must consider these new developments.

In *Kaiser Steel Corporation v. Mullins* the Supreme Court held that a company which had promised to contribute to union welfare funds was "entitled to plead and have adjudicated a defense that the promise is illegal under the antitrust and labor laws." [9] The collective bargaining agreement between Kaiser Steel and the United Mine Workers included a clause requiring Kaiser Steel to make contributions to union funds based on each ton of coal produced and each hour worked by employees, as well as on each ton of coal purchased from another operator who did not make contributions on his production. In a suit brought by the union funds to recover the latter form of contributions, Kaiser Steel sought to raise the defense that the purchased coal clause was void and unenforceable because it violated sections 1 and 2 of the Sherman Act and section 8(e) of the Labor Management Relations Act (which prohibits "hot cargo" clauses whereby an employer agrees not to do business with another employer). [10] The

district court rejected the defense and granted summary judgment for the fund trustees; a divided court of appeals affirmed. The Supreme Court reversed, holding that its cases left "no doubt that illegal promises will not be enforced in cases controlled by the federal law." [11]

The Court then turned to a statutory issue not previously addressed. On 6 September 1980, nine days after the court of appeals decision in *Mullins*, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980. [12] Section 306 of the Act provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement. [13]

Assuming arguendo that this new provision applied to *Mullins*, the Court determined that it did not change the result. The Act did not abolish illegality defenses, the Court found, but rather only unrelated or extraneous defenses. Also, finding an abolition of illegality defenses would create a partial repeal of the labor, antitrust, and other laws which might be cited as a defense to an action for collection of unpaid contributions. Since repeals by implication are disfavored, the Court found that the 1980 Act did not prevent Kaiser Steel from raising the defense of illegality. [14]

There are substantial reasons for believing that the combined effect of *Mullins* and the 1980 Act is to prohibit an employer from defending a trust fund suit on the basis of the alleged unenforceability of pre-hire agreements. The *Mullins* decision rest-

---

**9.** *Id.* 102 S.Ct. at 854.

**10.** 15 U.S.C. §§ 1, 2 (1976); 29 U.S.C. § 158(e) (1976).

**11.** 102 S.Ct. at 856.

**12.** Pub.L.No.96–364, 94 Stat. 1208.

**13.** 29 U.S.C.A. § 1145 (West Supp.1981).

**14.** 102 S.Ct. at 860–62. Three Justices dissented from the Court's interpretation of the 1980 Act. *Id.* 102 S.Ct. at 862 (Brennan, J., dissenting).

ed on the alleged *illegality* of the contract. Since payment by Overhead Door to the Funds pursuant to the prehire agreements would not be illegal, as allegedly would payment by a coal producer pursuant to the purchased coal clause, *Mullins* may be distinguished.[15] More important, the Court specifically cited legislative history indicating that the 1980 Act was intended to reverse the result in this very case: "Both [the House and Senate floor managers of the bill] also stated that they ... disapproved cases such as *Washington Area Carpenters' Welfare Fund v. Overhead Door Co.*, 488 F.Supp. 816 (DC 1980), *appeal pending ...*"[16] This specific reference in the legislative history, combined with the Act's purpose of making it easier for union funds to recover unpaid contributions, provides support for a holding that Overhead Door may not defend this suit on the basis of the alleged unenforceability of section 8(f) agreements.

Nonetheless, we have determined not to resolve this case on the basis of the 1980 Act. In the first place, there is a question whether the Act applies at all here, since the Court in *Mullins* refused to hold that the Act applied to cases pending on appeal.[17] And appellants themselves have

stated that the Act is not at issue in this case, instead relying on it only as evidence of a national policy in favor of enforcing contribution obligations.[18] More important, the unavoidable effect of preventing employers from raising the unenforceability defense in cases such as this one will be to make prehire agreements enforceable, at least retrospectively. There are no other means by which an employer may assert its position that section 8(f) agreements are never enforceable prior to recognition of the union as majority representative.[19] We prefer to resolve this issue on the basis of the history and purpose of section 8(f), rather than on the basis of the 1980 Act, which did not refer specifically to prehire agreements at all. Accordingly, we turn to the merits of Overhead Door's claim that its obligations under the prehire agreements are not enforceable.

## III. ENFORCEABILITY OF PREHIRE AGREEMENTS

### A. *Legislative History of Section 8(f)*

The general rule under the NLRA is that an employer commits an unfair labor practice by dealing with a union that does not have the support of a majority of work-

---

15. Overhead Door argues that the principle underlying *Mullins* and § 306(a) is that defenses are permissible when they relate directly to the enforceability of the contract itself. It notes that § 306(a) provides a cause of action for employers who are "obligated to make contributions" pursuant to "a collectively bargained agreement," 29 U.S.C.A. § 1145 (West Supp. 1981), and asserts that the "obligation" is what is in dispute here. A contrary reading, however, is at least as compelling. The terms of the prehire agreements clearly do obligate the company to contribute to the Funds, and in at least one other context prehire agreements have been found to constitute collectively bargained agreements. *See Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 875 (D.C.Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981).

16. 102 S.Ct. at 861 (citing 126 Cong.Rec. H7899 (daily ed. 26 Aug. 1980) (remarks of Rep. Thompson); *id.* at S11673 (daily ed. 26 Aug. 1980) (remarks of Sen. Williams)).

17. The majority assumed arguendo the applicability of the Act. *Id.* 102 S.Ct. at 860. The dissenters argued that there was no doubt that the 1980 Act did apply to pending cases. *Id.* 102 S.Ct. at 863 n.1 (Brennan, J., dissenting).

18. *See* Reply Brief for Appellants at 6 n.12; Supplemental Brief for Appellants at 4.

19. This is analogous to the *Mullins* majority's concern that preventing the defense of illegality would effectively create a partial repeal of the antitrust and labor laws. *See* 102 S.Ct. at 862. The dissenters disputed this, at least with respect to the antitrust laws, arguing that the employer could still sue for damages and injunctive relief under the Sherman Act. *Id.* 102 S.Ct. at 866 (Brennan, J., dissenting). In the case of prehire agreements, however, it is clear that preventing an employer from asserting their unenforceability in defense of a trust fund suit effectively makes them enforceable in that context.

   We also note that none of the circuit courts to address the 8(f) issue in the past two years have relied on the 1980 Act. *See* pp. 9–10, *infra*.

ers.[20] The underlying policy is to protect employee freedom of choice. "There could be no clearer abridgment of § 7 of the Act, assuring employees the right 'to bargain collectively through representatives of their own choosing' or 'to refrain from' such activity" than to grant "exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." [21]

Section 8(f) provides an exception to this rule for employers in the construction industry. This court recently described the congressional motivation for enacting this exception:

> Section 8(f) was enacted as part of the 1959 amendments to the National Labor Relations Act. The provision was added due to the peculiar nature of employment in the building and construction industry. As described in the Senate Report concerning § 8(f):
>
>> The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending on various stages of construction.
>
> S.Rep.No.187, 86th Cong., 1st Sess. 27 (1959), *reprinted in* I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (Legislative History), at 423 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318, 2344. As a result of these peculiarities, special arrangements became common in the construction industry. As described by the Senate Report:
>
>> In the building and construction industry it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects

are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated.

> *Id.* at 28; I Legislative History at 424, U.S.Code Cong. & Admin.News 1959, at 2344. The Report noted that these agreements have special advantages for employers as well as workers:
>
>> One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.
>
> *Id.*
>
> For these reasons and since the practice of signing such agreements was "not entirely consistent with Wagner Act rulings of the NLRB that exclusive bargaining contracts can lawfully be concluded only if the union makes its agreement after a representative number of employees have been hired," *id.*, Congress added § 8(f) to the Act. That provision authorizes employers in the construction industry to enter into comprehensive agreements with labor organizations that have not established majority status in the manner provided by § 9 of the Act. As the Senate Report bluntly concluded, "[r]epresentation elections in a large segment of the industry *are not feasible* to demonstrate such majority status due to the short periods of actual employment by specific employers." *Id.* at 55; I Legislative History at 451 (emphasis supplied), U.S.Code Cong. & Admin.News 1959, at 2373.

Congress thus expressly recognized that § 9(a) collective bargaining relationships are often not feasible in the construction industry. Due to the occasional nature of employment in that industry, unions and employers may enter "prehire" agreements that stabilize employ-

**20.** *See International Ladies' Garment Workers Union v. NLRB,* 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961).

**21.** *Id.* 366 U.S. at 737, 81 S.Ct. at 1607.

ment conditions in a particular geographic area over an extended period of time.[22]

By enacting this section, however, Congress did not eliminate its concern for both employer and employee freedom of choice. As the Supreme Court has held, "Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle." [23] Moreover, until the union gains full recognition, either the employees or the employer may petition the Board for a representation election.[24]

### B. *The Supreme Court's* Iron Workers *Decision*

In *NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers (Iron Workers)*,[25] the Supreme Court upheld a National Labor Relations Board (NLRB) determination that a union committed an unfair labor practice under section 8(b)(7)(C) by picketing to enforce a prehire agreement. An employer who had signed a prehire agreement established a separate company for the purpose of doing business with nonunion employees. The union considered this a violation of the agreement's multiemployer understanding, and it picketed at one jobsite for more than thirty days, the time period triggering applicability of section 8(b)(7)(C)'s prohibition of recognitional picketing.[26] The Board found that the picketing was unlawful because it was intended not merely to enforce the terms of the agreement but also to force the employer to recognize and bargain with the union.

The Supreme Court affirmed, emphasizing the substantial deference it gave to the Board's decision: "We have concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." [27] Although section 8(f) provides an exception to the rule regarding majority representation, the exception is narrow. "The employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites." [28] Section 8(f) does not expand the employer's duty to bargain with a majority union into a duty "to bargain with a union with which he has executed a prehire agreement but which has failed to win majority support in the covered unit." [29] To hold otherwise would contravene the clearly expressed congressional policy of maintaining the employees' freedom to choose their own representative. Accordingly, until majority support is gained, "the prehire agreement is voidable and does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer." [30]

### C. *Retrospective Enforcement of Prehire Agreements*

The three Acceptance Agreements called for Overhead Door to make specified contributions to the Funds on behalf of covered employees. The parties agree that these were prehire agreements. The sole issue before us, therefore, is whether Overhead Door is liable for the unpaid contributions

---

**22.** *Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 874 (D.C.Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981).

**23.** *NLRB v. Local 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 348 n.10, 98 S.Ct. 651, 659 n.10, 54 L.Ed.2d 586 (1978).

**24.** 29 U.S.C. § 158(f) (1976).

**25.** 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

**26.** 29 U.S.C. § 158(b)(7)(C) (1976).

**27.** 434 U.S. at 341, 98 S.Ct. at 655. *See also id.* at 350, 98 S.Ct. at 660.

**28.** *Id.* at 345, 98 S.Ct. at 657.

**29.** *Id.* at 346, 98 S.Ct. at 658.

**30.** *Id.* at 341, 98 S.Ct. at 655.

even though the union never attained majority status during the ten-year span of the agreements. Overhead Door bases its argument for unenforceability on language in *Iron Workers* stating that a prehire agreement is merely a " 'preliminary step' " and that "[t]he employer's duty to bargain and honor the contract is contingent on the union's attaining majority support." [31] The Funds, on the other hand, rely on the Court's statement that the agreements are "voidable," [32] interpreting this to mean that the contract is enforceable until it is voided by either party.

■ We hold that section 8(f) agreements are enforceable in a breach of contract action for the period from the date the agreement was made until the date when either party manifests its intent to void the agreement. We emphasize the limitations on this holding. Until the minority union obtains support of a majority of employees, the prehire agreement is not prospectively binding. Either party to the agreement may void it. While the agreement remains in effect, however, it must be observed by the parties.

This holding is based on our understanding of the congressional purposes underlying the exception for prehire agreements. As the legislative history of section 8(f) indicates, Congress recognized that the normal collective bargaining paradigm did not work in the construction industry. Permitting a minority union to make an agreement with an employer, often before the employer has hired any employees for a particular job, has many benefits for both parties. Employees gain the benefits of collective bargaining where it might otherwise be impractical. At the same time, they are free to call for a representation election if dissatisfied with the prehire agreement or any other aspect of the minority union's involvement. Employers are free to abstain from entering section 8(f) agreements, but when they do make them they are able to set labor costs in advance, to ensure a ready supply of workers, and to gain a measure of labor peace. In sum, both parties are able to enjoy the benefits of a stable employment relationship, while retaining freedom to alter that relationship. [33]

■ This analysis demonstrates that a prehire agreement serves two important purposes. First, it matures into a fully effective collective bargaining agreement once the union represents a majority of the workers. Second, it serves as the terms of employment for the workers hired by the consenting employer. It is indisputable that Congress intended the second purpose; otherwise, section 8(f) would not permit prehire agreements ever to be followed prior to the union's demonstration of its majority status. And given Congress' recognition that in many instances a union may find it difficult to establish its majority position, section 8(f) must contemplate that many prehire agreements will govern for a considerable period of time. [34]

In our view, recognition of these separate purposes compels our conclusion that prehire agreements are enforceable retrospec-

**31.** *Id.* at 345, 98 S.Ct. at 657. Overhead Door also cites the Court's statement that a previous decision, *Retail Clerks Int'l Ass'n, Locals 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962), could be reconciled with a holding "that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable." 434 U.S. at 352, 98 S.Ct. at 661. In *Lion Dry Goods* the Court held that § 301 of the Labor Management Relations Act confers jurisdiction on the federal courts to hear suits based on § 8(f) contracts. All *Iron Workers* added was that this holding did not compel the conclusion that § 8(f) agreements are enforceable, since the jurisdictional question differs from the enforce-ability question. Nothing further can be read into *Iron Workers*.

**32.** *Iron Workers*, 434 U.S. at 341, 98 S.Ct. at 655.

**33.** *See* pp. 6–7, *supra*.

**34.** "Due to the occasional nature of employment in [the construction] industry, unions and employers may enter 'prehire' agreements that stabilize employment conditions in a particular geographic area over an extended period of time." *Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 874 (D.C.Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981).

tively, but not prospectively. Congress intended that prehire agreements not have the same status as contracts between an employer and a recognized majority union. To hold that an employer is prospectively bound to follow section 8(f) contracts would contravene the principle that adherence to them be *voluntary*.[35] Moreover, it would effectively force the employer to recognize and bargain with a union before the union had proved its majority status. This result would violate the policy of employee free choice which was emphasized in the *Iron Workers* decision.[36]

Retrospective enforcement is a different matter. The prehire agreement sets the compensation for services rendered to the employer while the agreement remains in effect. We do not believe Congress intended to permit an employer to accept labor services under a prehire agreement, refuse to pay wages, and yet be immune from suit to recover the wages on the ground that the contract is unenforceable. Contributions to union welfare funds are as much a part of an employee's compensation as his hourly wages, and an employer should not be free to withhold either one.

This requirement is fully consistent with the Supreme Court's emphasis on employer and employee freedom of choice. We disa-gree with Overhead Door's contention that the "real issue" in this case is whether a minority union can force an employer to bargain with it.[37] There is no sense in which the Funds' contract action has a forbidden recognitional purpose, as did the picketing in *Iron Workers*. At any time the employer may avoid all future dealings with a minority union by simply declaring the prehire agreement void. Once this intention is manifested, the employer's obligation to follow the agreement ceases.[38] It remains liable, however, for obligations accrued while the agreement was in effect. Employees thus receive full compensation for services rendered, yet their freedom to choose their own bargaining representative is unimpaired. The minority union gains no added ability to ignore employee wishes, and the employer is under no greater obligation to deal with the union.

We note that of four circuit courts to rule on this issue, the Eighth, Ninth, and Tenth Circuits have held that union trust funds may recover unpaid contributions due under a prehire agreement;[39] only the Fifth Circuit has ruled to the contrary.[40] The reasoning of very recent decisions of the Eighth and Ninth Circuits is the same as we announce today.[41] We note that the Tenth Circuit, relying on an earlier Eighth Circuit decision, has suggested that prehire agree-

---

**35.** See *Iron Workers*, 434 U.S. at 347–48 & n.10, 98 S.Ct. at 658–59, & n.10.

**36.** See *id.* at 346–49, 98 S.Ct. at 658–59.

**37.** Brief for Respondent at 12.

**38.** We need not decide what specific act an employer must take to demonstrate its repudiation of a prehire agreement. The essential point is that the union and employees be put on notice that the contract is voided. It is clear on the record in this case that Overhead Door did not manifest the necessary intent. On the contrary, it signed new agreements each time it was asked to do so.

**39.** *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Associated Wrecking Co.*, 638 F.2d 1128 (8th Cir. 1981); *W. C. James, Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 646 F.2d 1292 (8th Cir. 1981); *Todd v. Jim McNeff, Inc.*, 667 F.2d 800 (9th Cir. 1982); *Western Wash. Laborers-Employers Health & Sec. Trust Fund v. McDowell*, 673 F.2d 1341 (9th Cir. 1982); *New Mexico*

*Dist. Council of Carpenters v. Mayhew Co.*, 664 F.2d 215 (10th Cir. 1981). *See also Trustees of Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp.*, 509 F.Supp. 1097 (N.D.Ga.1981); *Florida Marble Polishers Health & Welfare Trust Fund v. Megahee*, 102 L.R.R.M. (BNA) 2740 (M.D.Fla.1979); *Eastern Dist. Council of United Bhd. of Carpenters v. Blake Constr. Co.*, 457 F.Supp. 825 (E.D.Va. 1978).

**40.** *Baton Rouge Bldg. & Constr. Trades Council v. E. C. Schafer Constr. Co.*, 657 F.2d 806 (5th Cir. 1981). *See also Lail v. C&R Constr., Inc.*, No. 1–80–52 (E.D.Tenn. 26 Jan. 1981); *Vermeer v. Aloha Contractors, Inc.*, 90 Lab.Cas. (CCH) ¶ 12,466 (D.Or.1980); *Paddack v. Clark*, 90 Lab.Cas. (CCH) ¶ 12,494 (D.Or.1980).

**41.** See *W. C. James, Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 646 F.2d 1292, 1295 & n.4 (8th Cir. 1981); *Todd v. Jim McNeff, Inc.*, 667 F.2d 800, 802–04 (9th Cir. 1982).

**10**

ments are both retrospectively *and* prospectively enforceable in a contract action.[42] This reads *Iron Workers* narrowly as being limited to unfair labor practice cases, a reading with which we disagree. The Supreme Court was careful to state that the section 8(f) exception is limited to ensure that adherence be voluntary on the part of the employer. Essential to this principle, we believe, is the employer's ability to repudiate a prehire agreement while the union remains in a minority position.

We note also that a recent decision by the NLRB provides strong support for our determination that *Iron Workers* hinged on the Board's finding that the picketing there was conducted for a recognitional purpose. In April 1981 the Board held that a union which picketed for more than thirty days for the announced purpose of forcing an employer to make fringe benefit payments pursuant to a prehire agreement did not violate section 8(b)(7)(C). After reviewing the factual situation as a whole, the NLRB determined that "the sole purpose of the picketing" was to compel the employer to make the payments.[43] The Board noted: "Our decision is . . . consistent with the concept that relationships protected by Section 8(f) must be voluntary. The Respondent's picketing was limited to requiring the Charging Party to meet the obligations which allegedly had accrued under an 8(f) contract and was not directed at forcing continuation of the 8(f) relationship."[44] *Iron Workers* was distinguished: "Unlike that situation, the 'enforcement' sought by the Respondent's picketing was payment of an alleged past obligation under the 8(f) contract and did not require current application of the contract."[45]

The NLRB's reasoning applies as well to the case at hand. The Funds' lawsuit is limited to seeking payment by Overhead Door of unpaid contributions allegedly due under prehire agreements *which were never repudiated.* In no way can the suit force continuation of a section 8(f) relationship, nor can it impair employer or employee freedom of choice. Since *Iron Workers* itself rested substantially on deference to the NLRB's construction of the statute, this recent decision is entitled to due consideration. We find that our reasoning accords with that of the Board.

## IV. CONCLUSION

On remand the district court will need to consider two separate claims. The first is that Overhead Door's payments for its three union employees were based on an insufficient number of hours worked. This dispute turns on whether two of the union employees were engaged in carpentry work within the meaning of the agreements. The second is that contributions are owed for hours worked by nonunion employees. We hold that Overhead Door was obliged to make these payments. The district court should resolve any further disputes about which employees and hours were covered, and should consider any remaining defenses Overhead Door might legitimately raise, such as the relevant statute of limitations.

*Reversed and remanded.*

---

**42.** *New Mexico Dist. Council of Carpenters v. Mayhew Co.*, 664 F.2d 215, 219–20 (10th Cir. 1981) (relying on *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Associated Wrecking Co.*, 638 F.2d 1128, 1133–34 (8th Cir. 1981)). The broad holding in *Associated Wrecking* was cut back in *W. C. James, Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 646 F.2d 1292, 1295 & n.4 (8th Cir. 1981), which held that a prehire agreement was not prospectively enforceable.

**43.** *International Union of Operating Engineers, Local 150*, 255 N.L.R.B. No. 83, at 16 (6 Apr. 1981).

**44.** *Id.* at 17.

**45.** *Id.* at 19.