PAINTERS DISTRICT COUNCIL NO. 3 PENSION FUND, et al., Plaintiff,

v.

Tom JOHNSON, d/b/a De Be Painting Company, Defendant.

No. 78–0558–CV–W–4–9.

United States District Court, W.D. Missouri, W.D.

June 15, 1983.

---

Michael Arnold, Yonke, Shackelford & Arnold, Kansas City, Mo., for plaintiff.

Michael Delaney, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

BARTLETT, District Judge.

Pursuant to § 301 of the National Labor Relations Act (NLRA), 29 U.S.C. § 185, and § 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, three employee benefit funds seek payment of allegedly unpaid contributions and other related relief. There is no dispute that the plaintiffs are employee benefit funds as defined by ERISA, 29 U.S.C. § 1002(1), (2), and that the defendant engaged in business affecting commerce within the meaning of the NLRA, 29 U.S.C. §§ 151 and 185.

On July 5, 1973, Painters District Council No. 3 (union) and the Builders Association of Kansas City, Missouri (association) executed a collective bargaining agreement to be in effect from April 17, 1973, to March 31, 1976. Under Article VII of this agreement, each employer agreed "to pay for each hour worked in the area covered by this agreement" specified amounts to jointly administered fringe benefit funds.

On July 16, 1974, defendant signed a Contract Stipulation by which he "agrees with the Union to be bound by the terms of such collective bargaining agreement, subsequent collective bargaining agreements, [and] all fringe benefit agreements." The Contract Stipulation provided for termination as follows:

This stipulation which expressly applies to each and every term of the above agreements, shall be valid and effective when approved by the union and the proper undersigned Board of Trustees and shall remain in effect until five years from this date and thereafter shall automatically renew itself for a three-year period and at regular three-year intervals thereafter, unless either the employer or the union gives written notice of desire to terminate to the other party and to the proper Board of Trustees, no more than 90 days and no less than 60 days prior to any such three-year anniversary date.

At the same time that defendant signed the Contract Stipulation, he also signed a copy of the 1973 labor contract in effect at the time. A copy of this labor contract was "probably" mailed to him after he signed it. Defendant knew that he was agreeing to abide by the labor contract when he signed the Contract Stipulation. He knew that the labor agreement provided for fringe benefit contributions.

Before March 31, 1976, the anticipated expiration date of the 1973 collective bargaining agreement, the association and the union negotiated a new collective bargaining agreement effective September 5, 1975. Defendant was not notified that the association and the union were negotiating a new contract and defendant did not sign the 1975 collective bargaining agreement. However, defendant was notified that a new collective bargaining agreement had been executed by the association and the union. In defendant's September, 1975, monthly remittance report to plaintiff funds, the newly negotiated wage rates were shown.

From July 16, 1974, to March 31, 1976, the defendant did not pay his union and non-union employees on the same basis. He paid his union employees on the union scale including fringe benefit contributions. Defendant did not pay fringe benefit contributions on behalf of his non-union employees. However, all of his employees performed painting work in the Kansas City area.

Despite several visits to his jobsites by union representatives during 1974, 1975, and 1976, no grievance was ever filed objecting to the different wage rates or to defendant's failure to pay fringe benefits for non-union workers.

On January 5, 1976, Johnson drafted and personally put in the mail the following letter to the union:

Because we are a small business, we find it a hardship to keep good union men working during the slack season, and when we are busy and need men it seems none are available. Therefore, we are not extending our contract or bond for the next contract period.

Defendant wrote this letter because the painters sent by the union at defendant's request were not qualified. The union was not helping him in any way. Defendant intended by this letter to terminate his agreement with the union. Defendant did not notify the trustees of the plaintiff funds of his desire to terminate the agreement on March 31, 1976.

After sending the January 5, 1976, letter, defendant continued to pay fringe benefit contributions on his union employees until September, 1977, which he testified was the last date that he had a painter working for him who was a member of the union. Defendant felt that he should protect his union employees by paying fringe benefit contributions so long as he had union members employed.

On March 4, 1976, the union wrote defendant stating in part that "we are in the process of bringing our contractors into full compliance and in checking your file we find we are in need of the following items." The union then advised defendant that the wage and fringe benefit bonding requirement had been increased in the September, 1975, labor contract. After the bond expired which defendant had furnished in June, 1975, defendant did not furnish another surety bond to the union and did not comply with the union's request to file a bond in an increased amount.

In the same letter, the union requested that defendant execute one copy of the

September, 1975, labor contract and two copies of a new contract stipulation. Defendant did neither.

During 1976 and 1977, the union received certification from defendant's insurance company that he had workmen's compensation insurance and liability insurance. These certificates were sent by the companies automatically and not pursuant to defendant's specific request.

Defendant argues that he is not liable for any unpaid contributions because (1) defendant's 1976 termination was timely notice under the 1973 labor contract of his desire to terminate participation in the collective bargaining agreement; (2) the 1974 Contract Stipulation was not binding on defendant because it was not voluntarily signed by him; (3) plaintiff trust funds cannot enforce the collective bargaining agreements unless they show that a majority of defendant's employees were members of the union; (4) the 1974 Contract Stipulation is unenforceable to the extent that it purports to bind plaintiff to collective bargaining agreements which were not in existence when he signed the 1974 stipulation; (5) plaintiff trust funds are estopped from enforcing the collective bargaining agreements because they had not attempted to do so before filing this lawsuit.

### Defendant voluntarily and knowingly entered into the July 16, 1974, contract stipulation

Defendant challenges the validity of the July 16, 1974, Contract Stipulation because he contends that he had no choice but to sign it and the terms of the stipulation were never explained to him. Defendant relies on *Caporale v. Mar Less, Inc.,* 656 F.2d 242 (7th Cir.1981) in support of his argument that he did not objectively intend to be bound by the stipulation. However, the circumstances in this case are significantly different from *Caporale.* Here, defendant Johnson had been a painting contractor for twenty years and during that time had a continuing relationship with the union. In 1967, and 1969, defendant signed stipulations agreeing to abide by the terms of

collective bargaining agreements and to make payments to fringe benefit funds. When defendant signed the Contract Stipulation in July, 1974, he also signed a copy of the July 5, 1973, labor contract which was in effect at the time. A copy of this labor contract was "probably" mailed to him after he signed it. When defendant signed the Contract Stipulation in 1974, he knew that he was agreeing to abide by the labor contract and he knew that the labor contract provided for fringe benefit contributions by employers.

Thereafter, the parties' conduct was consistent with being mutually bound to the terms of the labor contract. Defendant made contributions to plaintiff funds after signing the Contract Stipulation. Defendant raised benefit contributions in September, 1975, when the wage rate was adjusted and began checking off union dues when required to under the labor contract. These facts are sufficient to indicate that defendant voluntarily consented to be bound by the terms of the labor contract in effect on July 16, 1974, when he signed the Contract Stipulation.

### Defendant's January 5, 1976, letter effectively terminated the prehire agreement entered into by him on July 16, 1974

■ Generally, under the NLRA, an employer commits unfair labor practice by dealing with a union that does not have the support of a majority of workers. The underlying policy is to protect employees' freedom of choice. *Washington Area Carpenters Welfare Fund v. Overhead Door Co.,* 681 F.2d 1, 5–6 (D.C.Cir.1982). Section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), provides an exception to this general rule by authorizing "prehire" agreements in the construction industry between an employer and a minority union:

It shall not be an unfair labor practice under § (a) or (b) of this section for any employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who upon their employment, will be engaged) in the building and construction

industry with a labor organization of which building and construction employees are members ... because (1) the majority status of such labor organization has not been established under the provisions of § 159 of this title prior to the making of such agreement .... provided ... that any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to § 9(c) or 9(e).

This provision was added in 1959 to the NLRA because a construction employee typically works for many employers and construction jobs are frequently of short duration. *Washington Area Carpenters, supra* at 6. The legislative history demonstrates Congress thought that these agreements had special advantages for employers as well as workers because of "the construction industry employer's need to 'know his labor costs before making the estimate upon which his bid would be based' and that the 'employer must be able to have available a supply of skilled craftsmen ready for quick referral.'" *Jim McNeff, Inc. v. Todd,* —— U.S. ——, 103 S.Ct. 1753, 1757, 75 L.Ed.2d 830 (1983) (quoting H.R.Rep. No. 741, 86th Cong., 1st Sess., 19 (1959), 1 Leg. Hist. 777, U.S.Code Cong. & Admin.News 1959, p. 2318.) *See also, N.L.R.B. v. Local 103 International Assn. of Bridge Workers,* 434 U.S. 335, 348–349, 98 S.Ct. 651, 659, 54 L.Ed.2d 586 (1978) and *Washington Area Carpenters,* 681 F.2d at 6.

■ By enacting § 8(f), Congress did not intend to abandon its concern for both employers' and employees' freedom of choice. *Washington Area Carpenters,* 681 F.2d at 7. "Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle." *Local 103,* 434 U.S. at 348 n. 10, 98 S.Ct. at 659 n. 10 (1978). Until a union attains majority support in a relevant unit, a prehire agreement is voidable by the employer. *Id.* at 341, 98 S.Ct. at 655–56.

■ Therefore, prehire agreements are enforceable until either party manifests an intent to void them. In *Washington Area Carpenters,* the Court stated:

We hold that section 8(f) agreements are enforceable in a breach of contract action for the period from the date the agreement was made until the date when either party manifests its intent to void the agreement. We emphasize the limitations on this holding. Until the minority union obtains support of a majority of employees, the prehire agreement is not prospectively binding. Either party to the agreement may void it. While the agreement remains in effect, however, it must be observed by the parties.

This holding is based on our understanding of the congressional purposes underlying the exception for prehire agreements....

....

*At any time the employer may avoid all future dealings with a minority union by simply declaring the prehire agreement void. Once this intention is manifested, the employer's obligation to follow the agreement ceases.* It remains liable, however, for obligations accrued while the agreement was in effect. Employees thus receive full compensation for services rendered yet their freedom to choose their own bargaining representative is unimpaired. The minority union gains no added ability to ignore employee wishes, and the employer is under no greater obligation to deal with the union.

681 F.2d at 8–9 (emphasis added) (footnotes omitted).

In *Jim McNeff, Inc. v. Todd,* —— U.S. ——, 103 S.Ct. 1753, 75 L.Ed.2d 830, the trustees of various fringe benefit trust funds sued under § 301 of the Labor Management Relations Act to compel an accounting and payment of any contributions found to be due the trust funds. The Supreme Court, resolving a conflict between the circuits, concluded that the employer could be required to fulfill monetary obligations assumed under a prehire contract even though the union did not attain majority support in the relevant unit. *Id.* at 1759.

Throughout the opinion the Court emphasizes the voidable nature of prehire agreements.

It is clear in this case that petitioner entered into the prehire agreement voluntarily. Moreover, although the *voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract,* it is equally clear that petitioner never manifested an intention to void or repudiate the contract.... Whatever may be required of *a party wishing to exercise its undoubted right to repudiate a prehire agreement* before the union attains majority support in the relevant unit, no appropriate action was taken by petitioner to do so in this case. *Consequently, respondents' suit does not enervate the voluntary and voidable characteristics of the prehire agreement.*

. . . .

Neither party is compelled to enter into a § 8(f) agreement. But when such an agreement is voluntarily executed, both parties must abide by its terms *until it is repudiated.*

A § 8(f) prehire agreement is subject to repudiation until the union establishes majority status. However, the monetary obligations assumed by an employer under a prehire contract may be recovered in a § 301 action brought by a union *prior to the repudiation of the contract,* even though the union does not attain majority support in the relevant unit. There having been no repudiation in this case, the judgment of the Court of Appeals is Affirmed.

*Id.,* 103 S.Ct. at 1758–59 (emphasis supplied) (footnotes omitted).

The Court did not decide what specific acts "would affect the repudiation of a prehire agreement" or "whether considerations properly cognizable by a court under § 301 might prevent either party, in particular circumstances, from exercising its option under § 8(f) to repudiate a prehire agreement before the union demonstrates majority status." *Id.* at 1759 nn. 11 & 13.

Even though the union in the instant case did not attain majority support from de-

fendant's employees, defendant voluntarily agreed to be bound by the terms of the existing collective bargaining agreement, including payment of fringe benefit contributions to plaintiff funds. Defendant's obligations under applicable collective bargaining agreements will be enforced until defendant repudiated his agreement. *McNeff, supra,* and *Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan v. Assoc. Wrecking Co.,* 638 F.2d 1128 (8th Cir.1981). The facts of this case, however, bring into focus the repudiation issues not reached in *McNeff* because there the employer "never manifested an intention to void or repudiate the contract." 103 S.Ct. at 1759.

Here, however, the defendant employer manifested his intent to void the contract. The letter of January 5, 1976, clearly stated defendant's desire to not be bound by his agreement with the union after March 31, 1976. Significantly, defendant gave as his reason for terminating one of the reasons Congress believed prehire agreements would benefit employers. This prehire agreement was not working for defendant because he was not getting skilled workers from the union. *McNeff,* 103 S.Ct. at 1759.

Defendant's letter was properly addressed to the union and was mailed by the defendant which creates a rebuttable presumption of fact that it was received by the addressee in the normal course of the mails. *Seven Provinces Ins. Co. Ltd. v. Commerce & Indus. Ins. Co.,* 65 F.R.D. 674, 683 (W.D. Mo.1975).

The present Executive Secretary of the union testified that defendant's January 5, 1976, letter was not in defendant's file thereby implying that it was not received. The fact that the letter was not in its proper file does not persuade me that the letter was not received. Also, the failure of the union to respond and the subsequent collection efforts are just as consistent with plaintiffs' position that the letter was ineffective to terminate the contractual relationship as with non-receipt of the letter. Significantly, the union wrote defendant on

March 4, 1976, stating that defendant was not in "full compliance" and requesting defendant to sign new Contract Stipulations. Under the union's interpretation of the 1974 Contract Stipulation, there was no need for defendant to sign a new Contract Stipulation *unless* the union was aware of defendant's desire to terminate as of March 31, 1976. Based on all of the foregoing, plus my observation of the union's Executive Secretary while testifying, I believe that the union received the January 5, 1976, letter and knew of defendant's desire to terminate the contractual relationship prior to March 31, 1976.

Plaintiffs argue that the attempted repudiation was ineffective because it was not in conformance with the termination provisions of the 1974 Contract Stipulation. Specifically, plaintiffs call attention to the fact that the Contract Stipulation provided that it would be in effect until five years from July 16, 1974, and that defendant had no termination rights during that period. Also, plaintiffs argue that defendant failed to give written notice to the Boards of Trustees of the three funds who were beneficiaries of the agreement as provided for in the Contract Stipulation.

■ Freedom to void prehire agreements by notifying the other party of an intent to do so is an essential part of national labor policy. Plaintiffs' and the union's effort to drastically limit by contract an employer's right to repudiate prehire agreements is unenforceable.[1] An employer's right to repudiate a prehire agreement is meaningless if an employer can be foreclosed by contract for a period of years from terminating at all as was attempted here. After the initial five year period when defendant could not terminate, he was afforded only a thirty day period every three years in which to terminate. Similarly, technical contractual

pitfalls for the unwary such as requiring notice to third parties as a condition to effective termination cannot be allowed to thwart an employer's reasonable efforts to terminate a prehire agreement. Here, the employer made a reasonable effort to notify the union, the party with whom defendant had contracted, of his desire to terminate.

■ Section 306(a) of the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1145, provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Although Congress intended by this amendment to ERISA to prevent employers in this type of case from raising unrelated defenses, "§ 306(a) explicitly requires employers to contribute to pension funds only where doing so would not be 'inconsistent with law.'" *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 861, 70 L.Ed.2d 833 (1982). To require defendant to contribute to plaintiff funds after the effective date of his repudiation would be inconsistent with the voidable nature of prehire agreements and, therefore, inconsistent with law. Therefore, § 306(a) does not bar defendant's repudiation defense. *Kaiser Steel, supra.*

■ Therefore, defendant's 1974 agreement with the union "to be bound by the terms" of the July 5, 1973, collective bargaining agreement and any renewals, modifications or extensions thereof, will be enforced until the effective date of his repudiation, March 31, 1976. After March 31, 1976, defendant voluntarily assumed the responsibility of paying fringe benefit contri-

---

1. "It is also well-established, however, that a federal court has a duty to determine whether a contract violates federal law before enforcing it. 'The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in ... federal statutes ....

Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.'" *Kaiser Steel Co. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982), quoting *Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948) (footnotes omitted).

butions for union members and has not in this proceeding repudiated this voluntary undertaking. Therefore, judgment will be rendered in favor of plaintiffs and against defendant for the amount of any unpaid contributions and other related relief established by plaintiffs for all of defendant's employees[2] from July 16, 1974, through March 31, 1976, and for defendant's union employees from March 31, 1976, to December 31, 1978.

### Damages

Plaintiffs performed an audit of defendant's books in January, 1979. Defendant does not contest the validity of this audit. In view of this Opinion, new calculations are necessary showing the delinquent contributions for all of defendant's employees through March 31, 1976, and for all of defendant's employees who were union members thereafter.

■ In addition to delinquent contributions, plaintiffs have requested liquidated damages, interest on the unpaid contributions, audit costs and attorney's fees. Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(2), requires that in addition to unpaid contributions, the Court award interest on the unpaid contributions, plus the greater of the amount of interest on the unpaid contributions or liquidated damages provided for under the plan, not to exceed twenty percent of the unpaid contributions, plus a reasonable attorney's fee, plus the costs of the action. Although defendant failed to make the contributions at issue in this case before September 26, 1980, the effective date of § 1132(g)(2), the provisions of that section will be applied retroactively unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Manifest injustice would not result from applying the provisions of § 1132(g)(2)

retroactively and there is no contrary statutory direction or legislative history. *Central States, Southeast and Southwest Areas Pension Fund v. Alco Express Co.,* 522 F.Supp. 919 (E.D.Mich.1981). Therefore, in addition to the unpaid delinquent contributions, plaintiffs will be awarded interest on the delinquent unpaid contributions, plus the amount of interest on the unpaid contributions or liquidated damages as provided in the plan not to exceed twenty percent, whichever is greater, plus a reasonable attorney's fee, plus the costs of this action including audit expense.

On or before June 27, 1983, plaintiffs will furnish to defendant their calculations of damages in accordance with this Opinion supported by whatever work papers are necessary to explain the manner in which the damage figures were calculated.

On or before July 8, 1983, defendant will advise plaintiffs whether he agrees or disagrees with the damage calculations submitted by plaintiffs. If defendant agrees with plaintiffs' damage calculations, a pleading stating the parties' agreement on damages, attaching a copy of plaintiffs' damage calculations, will be filed on or before July 12, 1983.

If defendant disagrees, he will furnish to plaintiffs a detailed and specific statement of each objection defendant has to plaintiffs' damage calculations. The parties will make a good faith effort to resolve their differences. On or before July 18, 1983, the parties will either file appropriate pleadings setting forth their conflicting positions on damages or a pleading stating their agreement.

IT IS SO ORDERED.

---

2. Although defendant testified that he made fringe benefit contributions only for his union employees, he has not argued in this proceeding that the trust agreements and labor con-

tracts required him to contribute only for his union employees. The trust agreements and labor contracts appear to require fringe benefit contributions for all employees.