**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRANSAMERICAN FREIGHT LINES, Inc., Respondent.**

**No. 12740.**

United States Court of Appeals Seventh Circuit.

March 3, 1960.

**312**

Thomas J. McDermott, Assoc. Gen. Counsel, Melvin Pollack, Atty., Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Fannie M. Boyls, John J. Stanton, Attys., N. L. R. B., for petitioner.

Herbert P. Wiedemann, Milwaukee, Wis., for respondent.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

Pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., the National Labor Relations Board here seeks enforcement of its Order of January 21, 1959, against Transamerican Freight Lines, hereinafter called "Transamerican".

With one exception (discussed below) the Board adopted the findings of fact, conclusions of law and recommendations of the Trial Examiner's Intermediate Report and Recommended Order.

Transamerican was charged with (1) refusal to bargain collectively with Automotive Mechanics Lodge No. 510, International Association of Machinists, AFL-CIO, hereinafter called the "Union"; (2) discriminatory discharge of one employee and transfer of another employee for union activity; and (3) interrogation of employees respecting union activity.

Transamerican is a common carrier of interstate and local freight by truck. Its terminal and garage at Milwaukee, Wisconsin, are in the charge of District Manager Jerome L. Cleaveland. We are concerned only with the garage employees who handle maintenance of operating equipment.

The Trial Examiner found that Transamerican had increased the garage personnel in the Milwaukee garage from two employees to four, in 1956. Garage personnel increased country-wide in a program of renovation to conform to Interstate Commerce Commission directives. It was anticipated that $6 million in new equipment would be acquired (as it was, in fact) making future economies in maintenance possible, but in April, 1957, garage staffs in the entire system had risen from 121 in January, 1956, to a high of 140. They were cut back to 123 by April, 1958.

Frank Matteoni testified that when hired, late in 1956, he stated on his employment form that he held a withdrawal card from the Union, and that District Manager Cleaveland then told him the garage was not "union" and that Cleave-

land would like to keep it that way. The drivers and dock men were covered by contracts with a teamsters' union.

The Trial Examiner found that about 3:00 or 3:30 P.M., May 21, 1957, District Manager Cleaveland received a letter from Union Representative Julius Drozewski in which Drozewski requested a conference to discuss a collective bargaining agreement, stating that a majority of the garage mechanics had authorized the Union to represent them.

About an hour later, Cleaveland discharged Matteoni, with the explanation that Cleaveland had orders to cut expenses. The Trial Examiner found that although reduction in force was being considered, Cleaveland had not, at that time, been instructed by his superiors to reduce his force in the Milwaukee garage. Evidence was adduced to show that decreasing profits dictated attempts to cut expenditures, that other garages of Transamerican operated with less help, that Cleaveland's action was economically motivated, and that Matteoni was the junior man in the garage.

From the coincidence of the time element and the fact that only Matteoni's union affiliation was then known to Cleaveland, the Trial Examiner inferred that the discharge was improperly motivated by Matteoni's union activity.

On May 24, 1957, Union Representative Drozewski called on Cleaveland and proffered signed membership cards of Matteoni, Melvin Olson, and James Getchell, which Cleaveland did not inspect. The Trial Examiner concluded that Cleaveland was not acting in good faith in declining to bargain when there was no doubt of majority representation. Transamerican argues that there were bona fide questions about the appropriate bargaining unit: as to whether it could properly include Frank Gage (who was subsequently found by the Trial Examiner to be a supervisor and not part of the unit) and whether the three other employees qualified as "mechanics".

On May 28th, Cleaveland transferred Getchell from the garage to the dock, assertedly to reduce both garage expense (by reducing staff) and dock expense (by cutting dock overtime.) Getchell was then junior man in the garage, but, as to Transamerican as a whole, he was senior to Olson, having previously worked on the dock.

Olson testified that Garage Supervisor Gage said he wished Olson had discussed joining the Union with Gage first, and that Cleaveland told Olson he could still back out of the Union. Getchell testified that Gage told him he would not have been transferred had he first talked to Gage.

C. J. Williams, associated with an employers' organization which contracts with the Union, testified that in a telephone conversation, Cleaveland had said he could not sign a contract with the Union because it did not represent a majority of the employees in the garage, that he had had other reasons for discharging Matteoni and transferring Getchell, mentioning dock overtime and need to cut expense, and that "he felt this was the best way out because then there would be no labor problem."

As with much of the evidence on which the Trial Examiner relied, this statement was susceptible of two inferences. Transamerican argues that the "labor problem" was one of excessive expense for personnel in the garage and excessive overtime expense on the dock. The Trial Examiner concluded that the "labor problem" referred to the majority representation by the Union of an appropriate bargaining unit which Cleaveland had thus dissipated. The Trial Examiner considered it of no significance that economic reasons might have justified a reduction in force because he found that the changes made were not, in fact, economically motivated.

The Board considering exceptions filed to the Intermediate Report and Recommended Order agreed with the Trial Examiner that Transamerican had discriminated in regard to tenure and conditions of employment; discouraged membership in the Union; failed and refused to bargain collectively with the Union; interfered with, restrained, and coerced

employees in the exercise of rights guaranteed by the Act.

■ With respect to the coercive effect of a question on union affiliation in the employment form blank, the Board did not adopt the Trial Examiner's theory that the interrogatory constituted a *per se* violation, but ' found that in the context of the unfair labor practices committed, the interrogatory had a coercive effect. Transamerican asserts that the last use of the interrogatory was in November 1956, and that the six-month limitation period of Section 10(b) of the Act precludes its designation as an unfair labor practice in the charge here which was filed July 3, 1957. As the Board based its finding, not on the original query, but on its relation to the subsequent use which was made of the information within the six-month period, we do not believe that designation of the interrogatory in this manner was precluded.

Transamerican was ordered, *inter alia,* to take affirmative action to offer Matteoni and Getchell full reinstatement; to make them whole for loss of pay; to bargain collectively with the Union as the representative of the employees in the appropriate unit.

Transamerican asserts that the findings of unlawful discrimination and unlawful refusal to bargain are not supported by substantial evidence. It appears to this Court that a close question of fact was presented as to whether the personnel actions were taken for valid existing reasons, or from discriminatory motives. The action taken immediately after receipt of the Union's communication could have been construed as an action based solely on economic reasons, merely triggered, so to speak, by the request for bargaining with reference to a situation which Cleaveland well knew was to be of temporary duration only.

■ However, it is not our function to weigh the evidence, and where there is substantial evidence in support of the findings on the record considered as a whole, including all inferences fairly drawn from that evidence, we must accept those findings, where, as here, one may draw two different inferences, with equal fairness, from the evidence presented, we must accept the inference drawn by the trier of the facts. N. L. R. B. v. Deena Products Co., 7 Cir., 1952, 195 F.2d 330, 334, certiorari denied 344 U.S. 827, 73 S.Ct. 29, 97 L.Ed. 644.

■ The Board adopted the Trial Examiner's finding that the question of whether, and if so, when, Matteoni and Getchell might eventually have been terminated or transferred for genuine economic reasons, was a matter for the compliance stage of the proceedings. However, if in fact, as appears likely, the personnel action would have been taken for genuine economic reasons prior to the Board's Order, the Board cannot now require Transamerican to restore Matteoni and Getchell to jobs that no longer exist. In oral argument, counsel for the Board conceded that the Board would not require Transamerican to re-engage Matteoni and Getchell regardless of whether Transamerican had an economic use for their services, but argued that this was a question for the compliance stage of the proceedings. The record shows that during the eleven months from the transfer of Getchell on May 28, 1957, until the Trial Examiner's hearings in April and May, 1958, only two men were employed in the garage. It does not appear to us that it is feasible to ignore that basic issue even for the time being. Without Matteoni and Getchell, there remains only one non-supervisory employee in the garage. An employer may voluntarily bargain with respect to one employee, but a one-man unit is not a certifiable bargaining unit.

The Board has dealt with the problem of changing circumstances before in Walter Holm & Company, 87 NLRB 1169, 1173 (1949) and Camp & McInnes, Inc., 100 NLRB 524 (1952), where the Board conditioned its order to bargain upon the employer's having in its employee employees in the appropriate unit for which the union had been certified.

■■ The Board's order to reinstate Matteoni and Getchell should be conditioned upon Transamerican's actual existing employment needs, and the order to bargain upon Transamerican's having employees in an appropriate bargaining unit. The dates on which Matteoni and Getchell would have been terminated for purely economic reasons had the Union made no demand must be ascertained. In this connection evidence excluded by the Trial Examiner, as to the quality of the work done by Matteoni and Getchell, becomes pertinent. Transamerican sought to show that the work done with the two remaining men was no less inadequate than the work previously done with all four men, in order to controvert testimony that maintenance was inadequate after the reduction in staff. The Trial Examiner allowed evidence to show that work was handled in a reasonably adequate fashion after the discharge of Matteoni and the transfer of Getchell. He excluded evidence of the quality of the work of Matteoni and Getchell as immaterial. He based this ruling on the fact that Transamerican admitted that the quality of their work was not the reason for the personnel action taken as to Matteoni and Getchell, who were admittedly not discharged and transferred for incompetence.

The fact that two superior workmen alone were able to complete as much work as had previously been accomplished by the two plus two others who were merely adequate workmen who required supervision, would go to show an economic motive. True, the Board found the economic motive present but not operative here. However, this evidence would be pertinent to the determination of whether and when the personnel action would have occurred for genuine economic motives and should have been admitted for that purpose.

■ Enforcement of the Order in its present terms is denied. This cause is remanded to the Board for further proceedings in conformity with the views expressed in this opinion.

Enforcement denied, remanded for further proceedings.