**OPERATING ENGINEERS PENSION TRUST and Operating Engineers Health & Welfare Fund, Plaintiffs-Appellants and Cross-Appellees,**

v.

**BECK ENGINEERING & SURVEYING CO., etc., et al., Defendants-Appellees and Cross-Appellants.**

Nos. 83–6455, 83–6498.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 7, 1984.

Decided Nov. 1, 1984.

Wayne Jett, Los Angeles, Cal., for plaintiffs-appellants and cross-appellees.

James G. Johnson, Hill, Farrer & Burrili, Los Angeles, Cal., for defendants-appellees and cross-appellants.

Before TUTTLE,[1] Senior Circuit Judge, and NORRIS and BEEZER, Circuit Judges.

TUTTLE, Senior Circuit Judge:

This action was brought under Section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185) and Section 502(a)(3) of the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1132(a)(3)) by two employee benefit trust funds seeking recovery of delinquent amounts claimed under a collective bargaining agreement. Plaintiffs and defendants both moved for summary judgment. The district court granted in part and denied in part each motion and rendered summary judgment disposing of all issues, from which plaintiffs have appealed and defendants have cross-appealed.

For the reasons stated below, we affirm the summary judgment in all respects.

## BACKGROUND

The employee in this case, Gary Giesseman, was employed from August 1978 by BBB Engineering and Survey Company ("BBB Engineering") as an office manager and secretary. BBB Engineering was a partnership between Victor Beck and Martin Bromberg, which was incorporated in June 1962 under the laws of California. It was engaged in the business of civil engineering and land surveying. Giesseman was the company's only employee at all times relevant hereto.

In February 1962, BBB Engineering had signed a short form agreement with Local 12 of the International Union of Operating Engineers ("Local 12"), binding itself to Local 12's Master Survey Agreement ("MSA") with the predecessor of the Southern California Association of Civil Engineers and Land Surveyors ("Association"). The MSA was subsequently renewed and modified in 1965, 1969, 1974, 1977, 1980 and 1983. The Association executed the 1977 and 1980 agreement.

---

1. Honorable Elbert P. Tuttle, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

Articles XIV and XV of the MSA (XV and XVI of the 1977 MSA) provided that employers were to pay fringe benefit contributions to the Operating Engineers Pension Trust and the Operating Engineers Health and Welfare Fund (hereinafter collectively "the Trusts") for each hour "worked by (or paid) each employee under this Agreement." In 1972 an identical provision in Local 12's Master Labor Agreement ("MLA") with another industry association was interpreted by a joint Labor Management Adjustment Board as requiring contributions based on all hours worked by a covered employee, even if his time was split between covered and non-covered work.

Ordinarily an individual employer would sign a short form agreement with Local 12 incorporating by reference the appropriate master agreement, depending on the type of covered work in which the employees were engaged. The MSA covered employees who worked as members of field survey parties. Field survey parties use surveying instruments and techniques to establish the location of boundary lines on real property or the location of particular features or improvements of real property. Often this is done at construction sites in connection with specific construction projects, both proposed and ongoing. Surveying jobs, such as the location of boundaries, may also be completely unrelated to construction.

Prior to October 1979, BBB Engineering had no employees doing work covered by the MSA. In October of that year Giesseman began doing some surveying work for BBB Engineering after he, Giesseman, was orally assured by someone at Local 12 that BBB Engineering would be required to pay fringe benefit contributions only for the hours in which he performed surveying work.

Giesseman joined Local 12 on October 3, 1979, and did his first surveying job on October 22, 1979. Giesseman prepared the employer monthly reports to the two Trusts and the contribution checks, reporting and paying on only those hours in which he had done surveying work.

In the spring of 1980, Bromberg retired and BBB Engineering was dissolved. Beck then formed his own surveying company, called Beck Engineering and Surveying Company ("Beck Engineering"), in May 1980, employing Giesseman in the same capacity as before. At Giesseman's urging, Beck agreed to sign a labor agreement with Local 12. The two of them met with Thomas Wadman, Local 12's business agent, on May 5, 1980. According to Giesseman, Beck told Wadman he could not hire Giesseman as a surveyor unless Giesseman could be utilized as a part-time surveyor and have fringe benefit contributions paid to the Trusts based only upon the actual number of hours worked in the field. Beck further guaranteed that contributions would be paid for not less than 200 hours per quarter. After consulting with Giesseman, Wadman then verbally assented. Beck then signed a new short form agreement. The written agreement, however, made no mention of the limitation on Beck's reporting requirement which allegedly had just been verbally arranged with Wadman.

In the fall of 1980, auditors for the Trusts determined that BBB Engineering and Beck Engineering were both liable for contributions on Giesseman's office work from the time that he began doing covered surveying work as well. When representatives of Local 12 and the Trusts refused to go along with the arrangement which Beck claimed had been orally worked out with Wadman, Beck sent a letter to Verne Dahnke of Local 12, dated January 30, 1981, advising him of Beck's intention "to terminate my company's Field Survey Agreement. Termination is to be effective as soon as permissible under the terms of the Agreement." Local 12 received this letter on February 3, 1981.

Further discussions concerning the company's liability for Giesseman's office hours continued until May 1981, but the dispute was not resolved. Meanwhile, Beck Engineering continued reporting

Giesseman's surveying hours at least until August 1982. The short form agreement which Beck had signed specified that it would remain in effect for the same term as the MSA and that it could be terminated only upon written notice by either party not less than 90 nor more than 120 days prior to the MSA's termination date. The MSA then in effect was not due to expire until August 1, 1983.

Like BBB Engineering, Beck Engineering was engaged in the business of civil engineering and land surveying. In a declaration, Beck estimated that ninety percent of his surveying work was related to ongoing or proposed construction. This included the preparation of topographical maps to be used during the course of construction for grading and other purposes, and the laying out of construction boundary stakes, related both to site preparation and excavation and to building placement. The remaining ten percent of the company's business consisted primarily of the location of property boundaries. Giesseman's surveying work was divided between construction and non-construction jobs in the same proportion.

On motions for summary judgment, the Trusts claimed that BBB Engineering and Beck Engineering owed benefit contributions for all hours worked by Giesseman from the time he began doing surveying work in October 1979 through December 31, 1982. The defendants claimed that, by virtue of the oral assurances made by Local 12's representatives, including Wadman, they were not liable for contributions on Giesseman's hours not spent on surveying work, and that Beck Engineering was not liable for anything after Beck sent his letter of January 30, 1981, terminating the agreement. The district court, in ordering summary judgment, found that the MSA required BBB Engineering and Beck Engineering to pay contributions on all hours worked by Giesseman from the time he began performing covered work and that the oral representations could not be relied upon as modifications of their obligations. However, he concluded further that Beck's

short form agreement with Local 12 was a construction industry pre-hire agreement permitted under § 8(f) of the LMRA (29 U.S.C. § 158(f)), terminable at the will of either party prior to the union's attainment of majority status, and that Beck Engineering effectively repudiated the agreement upon Local 12's receipt of Beck's letter on February 3, 1981. The court thus concluded that Beck was no longer bound by his agreement with Local 12 after that date. Damages for unpaid fringe benefit contributions for unreported hours worked by Giesseman as office manager from October 1979 through February 3, 1981, were fixed at $8,047.58. In addition, the Trusts were awarded $3,910.39 in prejudgment interest and an identical amount in statutory liquidated damages pursuant to 29 U.S.C. § 1132(g)(2)(C). Costs and attorneys fees were also awarded to the plaintiff Trusts.

## DISCUSSION

■ In reviewing the summary judgment, the test is whether, with respect to any dispositive issue, there is any genuine issue as to any material fact and, if not, whether viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is entitled to prevail as a matter of law. *Fruehauf Corp. v. Royal Exchange Assurance of America, Inc.,* 704 F.2d 1168, 1171 (9th Cir.1983); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.,* 707 F.2d 1030, 1033 (9th Cir.1983). The appellate court's task is identical to that of the trial court and the evidence is to be reviewed de novo. *Ward v. United States Department of Labor,* 726 F.2d 516, 517 (9th Cir.1984).

### A. *The Plaintiffs' Appeal*

#### (1) *Section 8(f) Pre-Hire Agreement*

The district court found that the two short form agreements under which Giesseman worked were both construction-indus-

try pre-hire agreements, authorized by Section 8(f) of the LMRA (29 U.S.C. § 158(f)).[2]

Section 8(f) provides an exception to the general rule that an employer who signs a collective bargaining agreement with a union which does not represent a majority of the employer's present workforce commits an unfair labor practice and that such an agreement is void and unenforceable. *NLRB v. Local Union No. 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 344–45, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978); *see also International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). A Section 8(f) contract is enforceable in a Section 301 suit. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 271–72, 103 S.Ct. 1753, 1757–1759, 75 L.Ed.2d 830 (1983). However, it is subject to affirmative repudiation by the employer at any time prior to the union's achieving majority status among the employees of the employer. *Id.* at 271, 103 S.Ct. at 1759; *Higdon Construction Co.*, 434 U.S. at 341, 98 S.Ct. at 655; *NLRB v. Pacific Erectors, Inc.*, 718 F.2d 1459, 1462 (9th Cir.1983).

The Trusts contend that neither of these agreements was a construction industry pre-hire agreement because each covered an employee, Giesseman, who performed work outside as well as in the building and construction industry. They do not dispute that ninety percent of Giesseman's surveying work was construction related. They insist, however, that Section 8(f) should be read narrowly to reach only agreements covering employees who are engaged *exclusively* in the building and construction industry.

By its terms, Section 8(f) imposes three prerequisites on a pre-hire agreement in order to bring the agreement within its coverage: (1) it must cover employees who are engaged in the building and construction industry; (2) the agreement must be with a labor organization of which building and construction employees are members; and (3) the agreement must be with an employer engaged primarily in the building and construction industry. *Forest City/Dillon-Tecon Pacific*, 209 NLRB 867, 870 n. 6 (1974) (administrative law judge's report), *enforced in pertinent part*, 522 F.2d 1107, 1109 (9th Cir.1975); *Animated Displays Co.*, 137 NLRB 999, 1020–21 (1962) (trial examiner's report), *enforced*, 327 F.2d 230 (6th Cir.1964).

No question has been raised in this appeal with respect to the second and third prerequisites. The union's members include building and construction employees. As to the employer, ninety percent of its surveying work is related to proposed and ongoing construction projects and is performed in large part at the job site. Under these circumstances, we believe that the district court was correct in its determination that the defendants were "engaged primarily in the building and construction industry" for the purposes of Section 8(f).

The Trusts concede that on its face the statute contains no requirement that the employees covered by a pre-hire agreement be engaged exclusively in the building and construction industry. However, they contend that, since Section 8(f) creates a narrow exception to the Act's underlying policy condemning representation by minority unions, the congressional purpose of limit-

---

**2.** Section 8(f) provides in pertinent part:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because

(1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such an agreement.... *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

29 U.S.C. § 158(f).

ing Section 8(f) to the construction industry compels such a restrictive interpretation of the statutory requirement. To our knowledge, neither the National Labor Relations Board ("NLRB" or "Board") nor any court has ever passed on this precise question.

In adopting Section 8(f), Congress recognized that the representation procedures prescribed in Section 9 of the Act were largely unsuited to the peculiar circumstances of the construction industry, where employers ordinarily hire on a project-by-project basis. In such a situation, "representation elections in a large segment of the industry are not feasible to demonstrate such majority status due to the short periods of actual employment by specific employers." S.Rep. No. 187, 86th Cong., 1st Sess. 55–56 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318, *reprinted in* 1 NLRB, *Legislative History of the Labor-Management Reporting & Disclosure Act of 1959*, at 451–52 (1959) (*Leg.Hist.*); *see also Jim McNeff*, 103 S.Ct. at 1756–57. Instead, Congress acknowledged that pre-hire agreements were appropriate in an industry where an employer who might employ no one unless he is working on a project, must nevertheless know his anticipated labor costs before making a bid and must have access to a readily available pool of skilled craftsmen. S.Rep. No. 187 at 28, 1 *Leg.Hist.* at 424.

■■■ We believe that the statutory requirement is satisfied if a substantial part of an employee's work is in the building and construction industry. We note that in defining the class of employers qualified to enter Section 8(f) agreements, Congress emphasized that it is not enough that an employer be merely one who is engaged in construction. Instead, the employer must be "engaged *primarily* in the building and

construction industry." 29 U.S.C. § 158(f) (emphasis added). As the decisions of the Board reveal, this qualification was intended as a limitation on the class of qualified employers, and an employer whose involvement in construction work is only a negligible part of his business is not entitled to enter pre-hire agreements. *Compare Frick Co.*, 141 NLRB 1204, 1208 (1963) (refrigeration manufacturer not primarily engaged in construction where installation work accounted for only 0.95 percent of its revenue), *with Carpet, Linoleum & Soft Tile Local No. 1247 (Indio Paint & Rug Center)*, 156 NLRB 951, 959 (1966) (where ninety-three percent of floor dealer's revenue derived from sale and installation of floor coverings, dealer was primarily engaged in construction).[3]

No such limitation is placed on the definition of employees who may be covered by a Section 8(f) pre-hire agreement. All that is required is that they be "engaged (or ... upon their employment, will be engaged) in the building and construction industry." 29 U.S.C. § 158(f). As noted above, counsel have not cited to us any cases in which the inquiry focused on the degree to which the employee's work, as opposed to the employer's business, was construction related to the employer's business was construction-related.

We believe that the congressional purpose, which was to balance the Act's policy disfavoring recognition of minority unions against the specialized needs of the construction industry, would be satisfied by a requirement that a substantial part of the work performed by employees covered by a pre-hire agreement be in the building and construction industry. We note that the trial examiner whose report was adopted by the NLRB in *Indio Paint & Rug Center*, cited by the Trusts, observed that no

**3.** However, so long as construction work constitutes more than an insubstantial part of an employer's business, the employer may be deemed "engaged primarily in the building and construction industry" for purposes of Section 8(f). *See A.L. Adams Construction Co. v. Georgia Power Co.*, 557 F.Supp. 168, *aff'd*, 733 F.2d 853 (11th Cir.1984) (power company could enter prehire agreements under § 8(f) with respect to construction of own facilities where it acted as own construction manager); *Zidell Explorations, Inc.*, 175 NLRB 887,.889 (1969) (company whose primary activity was dismantling of ships and wholesaling of scrap could enter § 8(f) agreement covering project to dismantle missile site where it frequently contracted to do similar jobs").

question was there raised "whether Indio Paint and Rug Center's employees [were] engaged, *primarily or to some lesser degree*, in the building and construction industry," 156 NLRB at 957 (emphasis added). That observation, although it is no more than dictum, suggests to us that the requirements of Section 8(f) would be satisfied by an agreement covering an employee or employees who were substantially engaged in the construction industry.

■ We conclude that Giesseman was sufficiently engaged in the building and construction industry to be covered by a Section 8(f) pre-hire agreement. The Trusts do not contend that surveying work was not a substantial portion of the work which he performed for the defendants. Since ninety percent of his surveying work was construction-related, his construction work was likewise sufficiently substantial to qualify these agreements under Section 8(f).

The Trusts, however, contend that a contrary result is required because the MSA would cover Giesseman even if none of his work were construction-related. Our conclusion that the agreements here were Section 8(f) agreements under all the circumstances does not imply that they would have so qualified if the employers' surveying businesses and Giesseman's work had not been primarily construction-related. Since, however, it is undisputed that ninety percent of Giesseman's surveying was done in conjunction with specific construction projects, both planned and ongoing, there is no reason to exclude these particular contracts from the coverage of Section 8(f).

### 2. *Repudiation*

Since Beck Engineering's agreement with Local 12 was a construction-industry pre-hire agreement, it was subject to repudiation by the employer at any time before the Union achieved majority status among Beck Engineering's employees. *Jim McNeff*, 461 U.S. at 271, 103 S.Ct. at 1759; *Pacific Erectors*, 718 F.2d at 1462. The district court found that Beck Engineering effectively repudiated the agreement upon Local 12's receipt of Victor Beck's letter to Verne Dahnke on February 3, 1981.

■ The Trusts contend that a Section 8(f) agreement may be repudiated only by means of a petition to the NLRB for a representation election under Section 9 of the Act (29 U.S.C. § 159). The Supreme Court has emphasized that a Section 8(f) pre-hire agreement may be repudiated only so long as majority status has not been established. *Jim McNeff*, 461 U.S. at 271, 103 S.Ct. at 1759; *Higdon*, 434 U.S. at 341, 98 S.Ct. at 655. Thus, in order to determine in a Section 301 suit whether an employer has effectively repudiated his Section 8(f) pre-hire agreement, a court must necessarily ascertain whether the union has established majority status in an appropriate bargaining unit prior to the asserted repudiation.

■ There is certainly merit to the Trusts' concern that, in a situation where an employer has more than one employee, the recognition of any alternative method of repudiation as the basis for a defense to a Section 301 suit would involve the courts in matters which are peculiarly within the primary jurisdiction of the Board. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 246, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). It is well settled that lack of majority status may not be asserted as a defense to a Section 301 suit for this very reason. *Glaziers & Glassworkers Local Union # 767 v. Custom Auto Glass Distributors*, 689 F.2d 1339, 1345 (9th Cir. 1982). Likewise, a union may not use a Section 301 suit offensively as a vehicle for establishing majority status, *Local No. 3-193 International Woodworkers of America v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1301 (9th Cir.1980), or determining an appropriate bargaining unit. *Brotherhood of Teamsters Local No. 70 v. California Consolidators, Inc.*, 693 F.2d 81, 83–84 (9th Cir.1982), *cert. denied* —— U.S. ——, 105 S.Ct. 263, 83 L.Ed.2d 199 (1984).

The Supreme Court in *Jim McNeff* expressly left undecided what action is neces-

sary to effectuate a repudiation of a Section 8(f) pre-hire agreement:

It is not necessary to decide in this case what specific acts would effect the repudiation of a prehire agreement—sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipatating a representation election pursuant to the final proviso in § 8(f) that shows the union does not enjoy majority support.

461 U.S. at 270–71 n. 11, 103 S.Ct. at 1759 n. 11: *see also Roberts v. Ayala,* 709 F.2d 520, 521 (9th Cir.1983).

Far from intimating that a representation proceeding should ordinarily be deemed the exclusive means of repudiating a Section 8(f) agreement, the Supreme Court has stated that the question remains very much an open one. We also note that, since the issuance of the Supreme Court's decision in *Jim McNeff,* the Eighth Circuit has held that "open and notorious acts by one party, known to the other, which are inconsistent with the continuance of the contract would, in our view, constitute sufficient notice of repudiation [of a Section 8(f) agreement]." *Contractors Health & Welfare Plan v. Harkins Construction & Equipment Co.,* 733 F.2d 1321, 1326 (8th Cir.1984). The court there implicitly concluded that a pre-hire agreement was repudiated no later than the date specified in an employer's notice of intent to terminate the agreement. *Id.; see also Washington Area Carpenters' Welfare Fund v. Overhead Door Co.,* 681 F.2d 1, 9 (D.C.Cir. 1982), *cert. denied,* 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 296 (1983).

We need not decide whether an employer of more than one employee may rely on affirmative conduct other than a petition for a representation proceeding under Section 9 to repudiate a Section 8(f) agreement, and we decline to do so. Thus, we are not now adopting a general rule that in all circumstances a Section 8(f) pre-hire agreement may be repudiated by any sort of unilateral conduct unequivocally manifesting an intention to void the agreement.

Instead, our decision has been specifically shaped to respond to the unique circumstances of a single-employee bargaining unit in the construction industry.

In the present case, it is undisputed that at all relevant times, the agreements in question each covered only one employee, Gary Giesseman. As a matter of long-standing policy, the NLRB will not certify or find appropriate a single-person bargaining unit in a representation proceeding. *Sunray Ltd.,* 258 NLRB 517, 518 (1981); *Roman Catholic Orphan Asylum,* 229 NLRB 251, 252 (1977). This is not merely a matter of the Board's discretionary jurisdiction. Rather it is a rule which is inherent in the structure and purpose of the Act:

The National Labor Relations Act creates the duty of employers to bargain collectively. But the principle of collective bargaining presupposes that there is more than one eligible person who desires to bargain. The Act therefore does not empower the board to certify where only one employee is involved. This conclusion does not mean that a single employee may not designate a representative to act for him; he had such a right without the act, and the act in no way limits the right.

*Luckenbach Steamship Co.,* 2 NLRB 181, 193 (1936), *quoted in American Radio Ass'n,* 258 NLRB 1251, 1258 (1981) (administrative law judge's report); *see also NLRB v. WGOK, Inc.,* 384 F.2d 500, 503 (5th Cir.1967); *NLRB v. Transamerican Freight Lines,* 275 F.2d 311, 314 (7th Cir. 1960).

Since the Board may not and will not ascertain majority status in a single-employee unit, it would be futile for the employer of a single employee to petition the Board for a representation election in order to repudiate his Section 8(f) pre-hire agreement. This Circuit has previously held that the primary jurisdiction rule does not require the dismissal of a Section 301 suit which raises a question of representation where the party bringing the suit has no standing to bring its case before the NLRB. *Laborers Health & Welfare Trust*

*Fund v. Kaufman & Broad, Inc.*, 707 F.2d 412, 415–16 (9th Cir.1983); *cf. Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 201–02, 98 S.Ct. 1745, 1759–60, 56 L.Ed.2d 209 (1978). The same rationale should extend to defenses which cannot be presented to the NLRB.

We hold that a construction industry employer who employs a single employee pursuant to a Section 8(f) pre-hire agreement is entitled to repudiate the agreement by conduct sufficient to put the union and the employee on notice that the agreement has been terminated. *See Harkins Construction*, 733 F.2d at 1326; *Overhead Door*, 681 F.2d at 9 n. 38. We emphasize that our holding is limited to a single-employee situation.

Consequently, if Victor Beck's letter of January 30, 1981, was sufficient to put the union and Giesseman, the only employee, on notice that he considered the agreement terminated, then Beck Engineering's agreement with Local 12 was repudiated and no longer binding on the employer as of February 3, 1981, the date that it was received by the union.

The Trusts contend that Mr. Beck's letter of January 30 did not express an unmistakeable intent to terminate the agreement. It is true that the letter states that termination was "to be effective as soon as permissible under the terms of the agreement." Article IV of the short form agreement provided that the agreement would remain in effect for the same term as the MSA and for any renewals or extensions thereof, unless either party gave written notice of termination not later than 90 nor more than 120 days prior to the expiration date of the MSA. The MSA then in effect was not due to expire until August 1, 1983.

Clearly, under the terms of the short form agreement, the letter of January 30, 1981 would have been a nullity, since it was not given during the thirty day period provided in the agreement. It would be unreasonable to believe that Mr. Beck, whose expertise was in surveying and civil engineering and not in the careful drafting of legal documents, intended that his letter should have had no legal effect at all. It would be equally unreasonable to believe that Beck wrote this letter after a series of fruitless negotiations with Local 12 and the Trusts concerning his company's obligations under the agreement, simply to indicate to Local 12 that he intended to remain bound by the agreement for another two and one-half years. Rather, the only reasonable interpretation is that he wanted to terminate the agreement as soon as he was legally entitled to do so.

The Trusts rely on the fact that Beck Engineering continued to submit reports on Giesseman's surveying hours until August 1982, the month following the initial filing of this suit, as evidence creating an issue of fact concerning whether the January 30 letter was a clear repudiation of the short form agreement. However, Giesseman himself, the only employee covered by the short form agreement, stated in a declaration that he prepared the letter for Beck's signature, "expressing Beck Engineering's intent to terminate the master survey agreement and, in effect, repudiating that agreement." Giesseman further declared that in a meeting in April or May of 1981 with Wadman and Dave Moody, apparently a representative of the Trusts, Mr. Beck asked if Beck Engineering would be permitted to pay only on the basis of Giesseman's surveying hours "in the event that Beck Engineering continued to be bound to the master survey agreement." Giesseman's declaration is uncontradicted.

As noted above, we believe that the January 30 letter clearly and unambiguously conveyed Beck's intention to terminate his company's agreement with Local 12 as soon as he was legally entitled to do so. This being the case, there is no ambiguity or uncertainty in the letter requiring the receipt of extrinsic evidence, and we will not consider extrinsic evidence, here the subsequent monthly reports, simply to create an ambiguity. *See Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied*, — U.S.

——, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984); *Appalachian Power Co. v. Federal Power Commission,* 529 F.2d 342, 348 (D.C.Cir.), *cert. denied sub nom. Kentucky Utilities Co. v. Federal Power Commission,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976).

Even if we were to accept the Trusts' argument that the letter is ambiguous on this point, Giesseman's declaration makes it clear that Beck intended the January 30 letter to serve as an immediate repudiation of the agreement and that Beck Engineering continued to report Giesseman's surveying hours only to protect itself against the contingency that the letter would ultimately be found ineffective as a repudiation, in which case Beck would be liable for unpaid contributions on Giesseman's surveying hours as well as his office hours. This was certainly the employee's understanding of Beck's position and it is clear that any contrary interpretation which the Union and the Trusts may initially have attached to the letter should have been dispelled at the meeting with Wadman and Moody.

We thus conclude that the plaintiffs' appeal does not demonstrate any outstanding material issues of fact. The district court correctly concluded that the agreements between Local 12 and BBB Engineering and Beck Engineering were construction industry pre-hire agreements under Section 8(f) of the LMRA, voidable at any time by the employer prior to the union's attainment of majority status; that Beck's letter of January 30, 1981, was a sufficiently clear manifestation of his intent to repudiate the agreement immediately; that the repudiation was effective on February 3, 1981, when the letter was received by Local 12; and that Beck Engineering had no further obligations under the agreement after

that date. The appeal of the Trusts is therefore dismissed.

### B. *The Defendant's Cross-Appeal*

#### 1. *The Oral Representations by Agents of Local 12*

The defendants contend that the district court erred in refusing to give any legal effect to the assurances made by Local 12 representatives before Giesseman started surveying or those made by Wadman at the time that Beck signed the short form agreement on behalf of Beck Engineering, to the effect that the companies would be required to pay fringe benefit contributions only on those hours which Giesseman spent in the field. This issue has been settled by two recent Ninth Circuit decisions, both of which the defendants ask this panel to overrule as "flatly wrong."

The defendants apparently have no quarrel with the general rule that Section 302(c)(5)(B) of the LMRA (29 U.S.C. § 186(c)(5)(B)),[4] implicitly prohibits oral modification of employee fringe benefit trust fund provisions in a collective bargaining agreement. *See Waggoner v. Dallaire,* 649 F.2d 1362, 1366 (9th Cir.1981). However, they suggest that the rule should be otherwise where all affected employees are aware of and consent to the proposed modification and it is shown to be fair to them. In other words, they would restrict *Waggoner v. Dallaire* to oral modifications which are unknown to the affected employee. This identical proposition was rejected by this Court in *Maxwell v. Lucky Construction Co.,* 710 F.2d 1395 (9th Cir.1983), to avoid "render[ing] the protective writing requirement less effective by exposing both union and employer to corrupt bargaining temptation." *Id.* at 1398. We are bound to follow that opinion. Even if we

---

**4.** Section 302(c) provides in pertinent part:

The provisions of this section [prohibiting employer payments to labor organizations generally] shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees,

families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer....

29 U.S.C. § 186(c).

were authorized to overrule another panel's decision, we would not be inclined to overrule *Maxwell*, since we believe that the rule announced therein is both salutary and entirely consistent with the congressional purpose of preventing corrupt bargains between unions and employers.

■ Thus, under *Maxwell*, the oral representations cannot be given effect as modifications of the agreements' fringe benefit provisions, even though those representations were made in Giesseman's presence and at his request.

The employers argue alternatively that the oral agreement allegedly made by Wadman and Beck at the May 5, 1980 meeting was not a modification of Beck Engineering's agreement with Local 12 but rather an interpretation or clarification of an ambiguous provision contained in that agreement.

In *Kemmis v. McGoldrick*, 706 F.2d 993 (9th Cir.1983), another surveying company, whose one employee divided his work between surveying and office work, sought to rely on oral representations made by Local 12 representatives at the time of contracting that the employer would be required to contribute only for the minimum 200 hours necessary for the employee to maintain eligibility for benefits. This Court there required the employer to pay contributions on the basis of all hours worked by the employee, holding that the same clause in the MSA that is at issue here is to be construed as a matter of law in the same way as the identical provision in the Master Labor Agreement.[5] *Id.* at 997. In *Waggoner v. C & D Pipeline Co.*, 601 F.2d 456 (9th Cir.1979), that provision was construed as applying to all hours worked by a covered employee. *Id.* at 459. In rejecting the employer's attempt to rely on oral representations similar to those made here, the *Kemmis* court observed, "Oral agreements between union representatives and employers regarding the meaning of a written trust fund agreement are difficult to prove. Judicial recognition of such oral statements invites collusion and controversy to the detriment of the employee beneficiaries." *Kemmis*, 706 F.2d at 996.

■ It is, of course, true that an employer and a union may orally agree to restrict the terms of a written master collective bargaining agreement in order to limit the scope of a bargaining unit. *Cappa v. Wiseman*, 659 F.2d 957, 960 (9th Cir.1981). Different considerations come into play, however, when the oral agreement may lead to varying obligations in the payment of contributions to employee benefit trust funds. In this situation the desirability of insuring uniform interpretation of collective bargaining agreements, *see Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1109 (9th Cir.1979), is particularly strong since the rights and expectations of other parties—the beneficiaries employed by other employers signatory to the MSA and those employers—may be affected. *Cf. Schneider Moving & Storage Co. v. Robbins*, — U.S. —, 104 S.Ct. 1844, 1849, 80 L.Ed.2d 366 (1984) (unreasonable to infer that parties to multi-employer trust fund agreements would agree to require trustees to arbitrate disputes under individual employer's collective bargaining agreements before seeking judicial enforcement of contribution obligations); *Lewis v. Benedict Coal Co.*, 361 U.S. 459, 461, 80 S.Ct. 489, 491, 4 L.Ed.2d 442 (1960) (rule that promissor may raise promisee's breach as defense to action by third-party beneficiary inapplicable in suit to recover unpaid employee trust fund contributions under industry-wide agreement since class of beneficiaries who would be affected includes other employers and their employees). Moreover, as noted in *Kemmis*, the provision at issue here is one which Con-

---

5. The defendants' assertion that *Kemmis* is procedurally distinguishable from this case is wholly untenable. There, as here, the employer sought to rely on oral clarifications of the language in the MSA as a defense to a Section 301 suit by the trustees of these same trust funds. The *Kemmis* panel rejected his defense on the basis of the interpretation previously applied by the court to the identical language in the Master Labor Agreement. *Id.* at 997. That is precisely the same procedural posture in which the issue has been raised in the present case.

gress has specified must be in writing, unlike the provision at issue in *Cappa. See Kemmis,* 706 F.2d at 996–97.

■ We conclude that *Kemmis* is dispositive of the defendant's contention that Wadman's oral representations should be admitted as a clarification of Beck Engineering's obligations under the agreement, and we are bound to follow that decision. The district court's grant of summary judgment requiring the employers to pay contributions on all hours worked by Giesseman is therefore affirmed.

## 2. *Attorney's Fees and Costs*

The defendants also appeal from the district court's denial of their motion for attorney's fees and costs with respect to that portion of the complaint as to which they prevailed.

■ Under 29 U.S.C. § 1132(g) a court in its discretion may allow a reasonable attorney's fee and costs of an action by a plan participant to either party. The grant or denial of an attorney's fees award is committed by the statute to the discretion of the district court, and it will not be disturbed unless there is a showing that the court abused its discretion. *Sapper v. Lenco Blade, Inc.,* 704 F.2d 1069, 1073 (9th Cir.1983); *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 452 (9th Cir.1980). An abuse of discretion is found only when there is a definite conviction that the court made a clear error of judgment in its conclusion upon weighing relevant factors. *Hummell* 634 F.2d at 452.

■ The district court, applying the factors set forth in *Hummell,* concluded that an award of attorney's fees and costs to the defendants was not justified. While the defendants challenge the district court's finding that the plaintiffs had not been shown to have acted in bad faith, neither this finding nor the district court's application of the *Hummell* factors represents such a clear error of judgment as to amount to an abuse of discretion, and the defendants' appeal from the denial of fees and costs is dismissed.

## 3. *Liquidated Damages*

Finally, the defendants appeal from that portion of the district court's order awarding liquidated damages equal to the amount of prejudgment interest awarded.

■ The district court's award of liquidated damages was proper and was consistent with the requirements of 29 U.S.C. § 1132(g)(2), which reads: "[T]he court *shall* award the plan ... (C) an amount equal to the *greater* of (i) Interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan...." *Id.* (emphasis added). It is settled Ninth Circuit law that this provision is mandatory and not discretionary. *Operating Engineers Pension Trust v. Reed,* 726 F.2d 513, 514 (9th Cir.1984); *Kemmis v. McGoldrick,* 706 F.2d 993, 997 (9th Cir.1983).

The district court awarded the Trusts $8,047.58 in damages for unpaid fringe benefit contributions, and $3,910.39 as prejudgment interest on the unpaid contributions. Local 12's MSA provided for liquidated damages of 10 percent of the total sum of the contributions found to be delinquent. Thus, under the MSA, the Trusts would have been entitled to $804.76 as liquidated damages. Clearly, the prejudgment interest exceeded that amount. The district court was thus statutorily required to award the Trusts an amount equal to the prejudgment interest as liquidated damages. The liquidated damages award is therefore affirmed and the defendants' appeal from this award dismissed.

The judgment of the district court is AFFIRMED, each party to bear its own costs.